IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JONATHON W. TROWBRIDGE,<br><br>   Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>   Defendant. | CASE NO. 3:23-cv-1042<br><br>DISTRICT JUDGE<br>JAMES G. CARR<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Jonathon Trowbridge filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In August 2016, Trowbridge protectively filed an application for Supplemental Security Income alleging a disability onset date of August 17, 2016,[1] and claiming he was disabled due to pervasive developmental disorders,

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006). An application is deemed protectively filed when the

autism, attention deficit hyperactivity disorder, and anxiety disorder. Tr. 164, 190, 191, 195. The Social Security Administration denied Trowbridge's application and his motion for reconsideration. Tr. 67, 85. Trowbridge then requested a hearing before an Administrative Law Judge (ALJ). Tr. 101.

In August 2018, an ALJ held a hearing, Tr. 34–52, and two months later issued a written decision finding that Trowbridge was not disabled, Tr. 15–27. Trowbridge appealed, and two years later the District Court for the Northern District of Ohio remanded the case back to the Agency. Tr. 973–94.

In May 2021, the ALJ held another hearing. Tr. 957–72. The next month, the ALJ issued a written decision finding that Trowbridge was not disabled. Tr. 932–48. The ALJ's decision became final on March 29, 2023, when the Social Security Appeals Council declined further review. Tr. 922–25; *see* 20 C.F.R. § 404.981.

Trowbridge filed this action on May 23, 2023. Doc. 1. He asserts the following assignment of error:

> The ALJ failed to properly evaluate Plaintiff's severe impairment of Mitochondrial Myopathy. As a result, the findings with respect to residual functional capacity are not supported by substantial evidence.

Doc. 8, at 2.

---

Agency finds that the claimant sufficiently communicated with the Agency prior to the submission of an official application so that the claimant receives the benefit of an earlier application date. *See* 20 C.F.R. § 416.340. Here, the ALJ found that Trowbridge had a protective filing date of August 2016. Tr. 15.

2

**Evidence**

*Personal and vocational evidence*

Trowbridge was born in 1994 and was 22 years old on the date he filed his application. Tr. 25. He has a high school education and no past relevant work. Tr. 25.

*Relevant medical evidence[2]*

In March 2015, lab work show that Trowbridge had a severe vitamin D deficiency and a slightly elevated alanine aminotransferase test (to check for liver damage). Tr. 366.

In May 2015, Trowbridge had an echocardiograph due to his reports of chest pressure and fatigue. Tr. 369. The test showed a low-normal left ventricular systolic function, trace-to-mild mitral regurgitation, trace tricuspid regurgitation, and trace-to-mild pulmonic regurgitation.[3] Tr. 369.

---

[2]     Trowbridge only challenges the ALJ's evaluation of his physical impairments, so I only cite the medical evidence corresponding to those impairments.

[3]     Mitral regurgitation is where the valve between the left heart chambers doesn't fully close. *See* https://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/symptoms-causes/syc-20350178 [https://perma.cc/M8HU-72B7]. Tricuspid regurgitation is where the valve between the right heart chambers doesn't fully close. *See* https://www.mayoclinic.org/diseases-conditions/tricuspid-valve-regurgitation/symptoms-causes/syc-20350168 [https://perma.cc/2962-BWB8]. And pulmonic regurgitation is where the pulmonary valve doesn't fully close. *See* https://www.mayoclinic.org/diseases-conditions/pulmonary-valve-disease/symptoms-causes/syc-20350654 [https://perma.cc/Q2XU-PP5V].

3

In July 2015, Trowbridge saw cardiologist Ronald Conner, M.D., to follow up after Trowbridge's echocardiograph. Tr. 457. Trowbridge reported significant exertional fatigue, frequent lightheadedness, and dizziness. Tr. 457–58. He denied chest pain or shortness of breath. Tr. 457. He completed a treadmill stress test, which resulted in calf muscle cramping and was negative for ischemia (inadequate blood supply). Tr. 457. Dr. Conner characterized Trowbridge's echocardiogram as an "overall reassuring study." Tr. 457. Trowbridge's physical exam findings were unremarkable. Tr. 458. Dr. Conner's impression was dysautonomia[4] with joint hypermobility syndrome, for which he prescribed midodrine. Tr. 458. Dr. Conner also listed an impression of chronic fatigue and remarked that Trowbridge was "being worked up for possible mitochondrial defect." Tr. 458.

Two weeks later, Trowbridge saw Certified Nurse Practitioner Rachel VanNiel and complained of fatigue. Tr. 363. VanNiel stated that Trowbridge "has features of Marfan's,[5] Muscular Dystrophy, and M[ultiple] S[clerosis]," and that "given his broad symptoms and family history," she recommended "a wide net" of future testing. Tr. 364.

---

[4]    Dysautonomia is an autonomic nervous system malfunction. *See* Dorland's Illustrated Medical Dictionary 569 (33rd ed. 2020).

[5]    Marfan syndrome is a connective tissue disorder. *See* Dorland's, *supra*, at 1808.

In August 2015, Trowbridge followed up with Dr. Conner "for syncope related to orthostasis."[6] Tr. 455. Trowbridge stated that he began taking midodrine the week before the appointment and then had stopped taking it because of insomnia, which persisted. Tr. 455. Trowbridge reported dizziness. Tr. 455. His physical exam findings were unremarkable. Tr. 455–56. Dr. Conner assessed dysautonomia and modified Trowbridge's midodrine dosage. Tr. 456. Dr. Conner commented that if Trowbridge "continues to have low blood pressure issues and fatigue," they could try a different medication, but it "seemed that [Trowbridge] did have some improvement on the midodrine." Tr. 456. He "counseled [Trowbridge] strongly on the importance of diet and … exercises" and encouraged Trowbridge to perform 15 to 20 minutes of aerobic exercise three to four days per week. Tr. 456.

In November 2015, Trowbridge saw Dr. Conner. Tr. 452. Trowbridge's blood pressure was better, but he reported decreased energy, daytime sleepiness, lightheadedness, and dizziness. Tr. 452. Trowbridge was not getting any deliberate exercise and spent most of the day in in the basement in front of his computer. Tr. 452. He had stopped taking midodrine because he believed that it caused him to develop insomnia. Tr. 452. Trowbridge advised that he was awaiting biopsy results for mitochondrial defects. Tr. 452. His physical exam findings that day were unremarkable. Tr. 452–53. Dr. Conner

---

[6]     Syncope-related orthostasis is when a person faints when changing positions due to low blood pressure. *See* Dorland's, *supra*, at 1788.

remarked that Trowbridge's "mild dysautonomia appear[ed] to be improved" and he "suspect[ed] really [Trowbridge's] inactive lifestyle is leading to decrease[d] energy and poor sleep habits." Tr. 453. Dr. Conner also assessed mild joint hypermobility syndrome and mild mitral regurgitation. Tr. 453.

In February 2016, Trowbridge visited a family practice to establish care. Tr. 501. His mother told the doctor that he had low energy, needed to take breaks when helping with things like groceries, and got dizzy with lifting and carrying. Tr. 501. Trowbridge's exam findings were unremarkable. Tr. 504. The doctor ordered blood work and assessed chronic fatigue syndrome, dysautonomia with paresthesias, and a vitamin D deficiency. Tr. 505. She provided Trowbridge with a new neurology referral for dysautonomia. Tr. 505.

In May 2016, Trowbridge visited Dr. Conner's practice and saw Todd Monroe, M.D. Tr. 450–51. Dr. Monroe noted that Trowbridge "[did] not really report any significant symptoms," and instead just said that he "gets a little dizzy and lightheaded sometimes with position changes." Tr. 450. Dr. Monroe noted that Trowbridge was not very physically active and didn't go outside much. Tr. 450. Trowbridge stated that he was fatigued and that when he exercised, he felt a burning sensation in his lower left leg and it felt hot to the touch. Tr. 450. Dr. Monroe commented that Trowbridge's echocardiogram "was basically unremarkable." Tr. 450. Trowbridge's exam findings were unremarkable. Tr. 451. Dr. Monroe concluded that Trowbridge "ha[d] no specific cardiac complaints." Tr. 450. Dr. Monroe "did not recommend any

6

changes to [Trowbridge's] present regimen" and advised Trowbridge to return in one year. Tr. 450. Dr. Monroe ordered a left lower leg venous duplex study, which was negative for deep vein thrombosis. Tr. 451, 477.

In early June 2016, Trowbridge saw neurologist Boyd Koffman, M.D., for muscle weakness. Tr. 656. Trowbridge said that over the last four to five years, he had become increasingly "easily tired and … fatigue[ed]." Tr. 656. He reported difficulty lifting weights, carrying groceries, and "running on a treadmill for more than ½ a mile without taking a break." Tr. 657. Trowbridge also described occasional muscle twitching and hand tremors and he felt light-headed when he stood up. Tr. 567. He denied dizziness. Tr. 567. Dr. Koffman's exam findings showed that Trowbridge had normal strength, sensation, gait, reflexes, and coordination. Tr. 685. Dr. Koffman ordered lab work and an electromyography and nerve conduction study (EMG/NCS). Tr. 658.

Two weeks later, Trowbridge visited his family doctor. Tr. 492. He reported numbness and tingling in his legs and toes after riding a bike a few days before the visit. Tr. 492. He stated that his feet had been paralyzed, he felt like he was going to pass out, and he experienced fatigue for a few days following the incident. Tr. 492. Trowbridge denied dizziness and denied performing routine exercise. Tr. 492. On exam, Trowbridge was obese, had a normal gait, "[n]o mobility limitations," and normal sensation. Tr. 495. The provider assessed paresthesias, chronic fatigue syndrome, and generalized

muscle weakness. Tr. 495. Trowbridge was instructed to continue his scheduled testing and follow-up visits with specialists. Tr. 495.

An electromyography in July was normal. Tr. 506–07.

In October 2016, Trowbridge had a follow-up appointment at his family doctor's office. Tr. 482. Trowbridge said that he had been out of his medication for three weeks. Tr. 482. He reported some fatigue with increased activity over the weekend, which resolved once he stopped to rest. Tr. 482. He denied dizziness and difficulty walking. Tr. 482. He said that his paresthesia and burning-sensation only occurred during exercise and it resolved at rest. Tr. 482. Trowbridge's exam findings were normal, although his vitamin D level was low. Tr. 485. The doctor assessed Trowbridge with vitamin D deficiency, paresthesias, and sedentary lifestyle. Tr. 485. He ordered lab work to check Trowbridge's vitamin B12 and D levels. Tr. 486. He opined that Trowbridge's vitamin D deficiency was likely due to Trowbridge's dietary inadequacies, lack of exercise, and the fact that Trowbridge rarely spent time outside. Tr. 486. The doctor commented that Trowbridge's paresthesias was due to a lack of movement, deconditioning, and a potentially low vitamin B12 level. Tr. 486. He instructed Trowbridge to exercise by walking around the block at least 30 minutes three times per week. Tr. 486.

In December 2016, Trowbridge saw Roberta Guibord, D.O., for a second opinion about his reported hand tremors and other issues with his health. Tr. 593. Trowbridge's exam findings were unremarkable, including normal

8

walking. Tr. 595. Dr. Guibord assessed Trowbridge with obesity, vitamin D deficiency, fatigue, vitamin B12 disorder, and parasthesia. Tr. 596. She ordered bloodwork. Tr. 596. Trowbridge returned the following month to review his bloodwork, Tr. 597, which showed elevated liver enzymes, a vitamin D deficiency, and a "heterozygous methylenetetrahydrofolate reductase mutation."[7] Tr. 600. Dr. Guibord increased Trowbridge's vitamin D supplement. Tr. 600.

About a week later, Trowbridge followed up with Dr. Koffman for muscle weakness. Tr. 650. Trowbridge reported shortness of breath while walking; feeling lightheaded on standing; extreme fatigue with exertion; muscle, joint, and back pain; dizziness; and fatigue that "comes and goes." Tr. 651. He described episodes of near-fainting during exertion, intermittent hand and arm tremors, and intermittent numbness in his fingers and lower legs. Tr. 652. Dr. Koffman noted that prior testing (brain and cervical spine MRIs, EMG/NCS, and "other labs") were normal. Tr. 653. Trowbridge's motor exam findings showed normal bulk, tone, and strength. Tr. 653. Trowbridge had normal coordination, sensation, and reflexes. Tr. 653. His gait and station were described as "narrow base and normal stride" and he could "[t]oe, heel, and tandem gait." Tr. 653. Dr. Koffman referred Trowbridge to Dr. Cameron, a

---

[7]     A heterozygous methylenetetrahydrofolate reductase mutation (MTHFR) may contribute to a variety of health concerns. *See* https://www.medicalnewstoday.com/articles/326181#:~:text=If%20the%20MT HFR%20gene%20that,(homozygous)%20of%20these%20genes [https://perma.cc/Y4F9-6PG3].

pediatric neurologist, and a cardiologist for further consultation of a possible genetic disorder and dysautonomia. Tr. 654.

In February 2017, Trowbridge saw neurologist Rebecca Kuenzler, M.D., to be evaluated for myopathy and possible mitochondrial and autonomic problems. Tr. 691. Trowbridge's mother reported that Trowbridge always had "less energy," but it seemed to get worse in about 2014. Tr. 691. She also stated that around 2014, Trowbridge started having hand tremors, twitches, and his legs shook when he squatted. Tr. 691. Trowbridge reported intermittent foot and hand numbness. Tr. 691. Dr. Kuenzler noted that Trowbridge had a history of elevated liver enzymes and that his vitamin D level remained low despite supplementation. Tr. 691. Dr. Kuenzler's exam findings showed that Trowbridge had non-tender joints, minimal peripheral edema, a hypermobile range of motion, no paraspinal tenderness, and a single palmer crease and short fifth digit in his hands. Tr. 693. Trowbridge had increased reflexes, intact sensation, and an intact gait. Tr. 693. He had full strength and normal muscle tone and bulk. Tr. 693. Dr. Kuenzler agreed that Trowbridge should have chromosome and fragile X testing[8] as a pediatric neurologist had recommended. Tr. 693. She noted that Trowbridge's siblings had "variable issues of [pervasive developmental disorders] and sensory processing

---

[8]     Fragile X syndrome causes an intellectual disability. *See* Dorland's, *supra*, at 1800 (33rd ed. 2020).

disorders" which "raise[d] concern for a hereditary, possibly mitochondrial, process."[9] Tr. 693.

In July 2017, Trowbridge saw Dr. Koffman for a follow-up. Tr. 812. Trowbridge reported weakness, dizziness, numbness, and fatigue. Tr. 814. Trowbridge's then-recent chromosomal and fragile X tests were normal. Tr. 815. Autonomic testing was normal. Tr. 815. On exam, Trowbridge had normal muscle bulk, tone, and strength. Tr. 816. He had normal reflexes, coordination, sensation, and gait. Tr. 816. Dr. Koffman ordered a liver ultrasound and lab work and referred Trowbridge to a gastroenterologist for right upper quadrant pain and fatigue. Tr. 817.

Trowbridge's liver ultrasound showed "[c]oarse and echogenic liver suggesting diffuse hepatocellular disease," most likely fatty liver disease. Tr. 783.

In August 2017, Trowbridge saw rheumatologist Bashar Kahaleh, M.D. Tr. 806. Dr. Kahaleh's exam findings showed that Trowbridge had a normal gait, reflexes, and sensation. Tr. 808–09. His musculoskeletal exam was normal except for hypermobility in his ankles and fingers. Tr. 809. Dr. Kahaleh noted that Trowbridge "had significant testing done to identify the etiology of his hypermobility [but] all reported to be normal." Tr. 809. He suspected

---

[9]     Mitochondrial diseases are genetic conditions in which the body's cells don't produce enough energy. *See* https://my.clevelandclinic.org/health/diseases/15612-mitochondrial-diseases [https://perma.cc/H2U5-7F86]

Marfan syndrome and diagnosed Trowbridge with hypermobility syndrome and disorder of connective tissue. Tr. 809.

In February 2018, Trowbridge saw Dr. Koffman and complained of fatigue and shortness of breath on exertion. Tr. 780. Trowbridge reported muscle weakness, extremity swelling, dizziness, and restless legs. Tr. 782. He hadn't had near-fainting episodes "in quite a while." Tr. 783. He experienced difficulty walking "beyond a certain distance" and "may" suddenly feel his leg burning. Tr. 783. His mother reported that Trowbridge turned pale when this happened. Tr. 783. Dr. Koffman wrote that a then-recent test indicated that "dysautonomia was considered unlikely." Tr. 783. Trowbridge's exam findings showed that he had normal muscle tone, bulk, and strength; normal reflexes and coordination; and a normal stride with a "narrow base" gait. Tr. 785. Dr. Koffman opined that the only neurologic lesion he "could conceive of based on symptoms of impaired endurance is mitochondrial cytopathy," a type of mitochondrial disorder. Tr. 786. He noted that Trowbridge's shortness of breath on exertion could be "related to deconditioning and obesity" and that Trowbridge's autoimmune hepatitis "may contribute to fatigue." Tr. 786. He referred Trowbridge to neurosurgery for a muscle biopsy to exclude mitochondrial cytopathy. Tr. 786.

About a week later, Trowbridge saw neurosurgeon Azedine Medhkour, M.D. Tr. 776. Trowbridge reported reduced endurance, tiring quickly, lightheadedness, and burning and shortness of breath when walking. Tr. 776.

12

Trowbridge's exam findings showed normal reflexes, sensation, gait, and station. Tr. 779. Dr. Medhkour diagnosed muscle fatigue and ordered a muscle biopsy. Tr. 779. The biopsy showed "a number of mitochondria with abnormal morphology" which was "suggestive of a potential metabolic problem or a mitochondriopathy." Tr. 823. At a follow-up visit, Dr. Medhkour diagnosed Trowbridge with mitochondrial myopathy and advised him to follow up with Dr. Koffman "for . . . refer[r]als and possible treatment based off of the biopsy results." Tr. 776.

In June 2018, Trowbridge saw pediatric neurologist Marvin Natowicz, M.D., at a genetics clinic to be evaluated for chronic fatigue and exercise intolerance. Tr. 851. Dr. Natowicz reviewed Trowbridge's history of complaints, muscle biopsy results, and other testing. Tr. 851–55. Dr. Natowicz's exam findings showed that Trowbridge had high arches in his feet "but otherwise [a] normal gait," normal strength and muscle tone, and no involuntary movements. Tr. 858. He had normal reflexes, and intact sensation. Tr. 858. He had "tight heel cords" and hypermobility of his ankles and fingers. Tr. 858. Natowicz explained that, overall, Trowbridge's neurological exam was unremarkable. Tr. 858. He wrote that there was no cardiopulmonary basis for Trowbridge's exercise intolerance and "no evidence thus far for autonomic nervous system dysfunction." Tr. 859. Natowicz commented that Trowbridge's "weight status and deconditioning are likely contributing factors," and added

13

that Trowbridge's non-severe liver dysfunction might also be a factor. Tr. 859.

Dr. Natowicz commented:

> The muscle biopsy result raises a question of a primary vs. secondary metabolic disorder involving mitochondrial bioenergetics. The diagnostic evaluation for this category of conditions has thus far been unremarkable. The work-up for a possible syndromic basis of [Trowbridge's] clinical condition has included a normal chromosomal microarray analysis. A syndromic condition and an underlying metabolic disorder remain considerations, however.

Tr. 859. Dr. Natowicz's plan included selected metabolic testing and to save DNA for possible later molecular genetic testing. Tr. 859. He advised Trowbridge to return in six months. Tr. 859.

In September 2018, Trowbridge visited Dr. Koffman's office and reported persistent symptoms of fatigue and exercise intolerance Tr. 1359. Trowbridge's mother advised that Trowbridge was planning to undergo whole genome sequence testing and Trowbridge was told to follow up with Dr. Koffman after that testing. Tr. 1354, 1359.

In March 2019, Trowbridge saw pediatric cardiologist Blair P. Grubb, M.D., for postural tachycardia syndrome,[10] and Dr. Grubb proscribed medication to treat Trowbridge's symptoms. Tr. 1524.

---

[10] Postural orthostatic tachycardia syndrome (POTS) is a condition that causes symptoms when one transitions from lying down to standing up, like a fast heart rate, dizziness, and fatigue. *See* https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots [https://perma.cc/4HTW-KX8N].

14

In April 2019, Trowbridge visited his family doctor's office and saw Cuneyd Tolek, M.D. Tr. 1400. Dr. Tolek wrote that Trowbridge had multiple comorbidities but no acute issues. Tr. 1400.

In June 2019, Trowbridge saw podiatrist Bradley Adams, DPM, for "weak ankles" and reported that his toenails hurt. Tr. 1169. He denied numbness and tingling. Tr. 1170. Dr. Adams assessed Trowbridge with toenail fugus and debrided Trowbridge's toenails. Tr. 1169.

In July 2019, Trowbridge had a three-month check-up with Dr. Tolek and said that he was "happy and productive" and had no acute issues. Tr. 1393.

In August 2019, Trowbridge visited the orthopedics clinic and complained of heel-cord tightness that had been present since birth. Tr. 1467. Trowbridge noticed that he couldn't tolerate walking long distances or doing heavy activity without feeling pain and weakness in his calf muscles. Tr. 1467. He had no complaints about his legs otherwise or about his ability to perform activities of daily living. Tr. 1467. X-rays showed significant high arches in Trowbridge's feet and no other abnormalities. Tr. 1468. Trowbridge's exam showed that he had a normal gait but walked with a 20-degree "external rotation." Tr. 1468. Trowbridge was fitted for custom orthotics and referred to physical therapy. Tr. 1467. In September, Trowbridge returned to the clinic and reported "significant improvement with physical therapy." Tr. 1467. He continued to perform his home exercises and was awaiting his orthotics. Tr. 1467.

Also in September 2019, Trowbridge visited the Syncope and Autonomic Disorders Clinic. Tr. 1494. Trowbridge said that he stopped taking all of his medications one month before the appointment because he was tired of taking medications. Tr. 1494. He reported fatigue and weakness, but no syncope. Tr. 1494. He was eating more salads. Tr. 1494. The nurse stated that she discussed medication use with Trowbridge; settled on a reasonable medication plan; and advised Trowbridge to return "yearly." Tr. 1494. The nurse wrote that Trowbridge was attending physical therapy "and improving with some strength." Tr. 1494.

In November 2019, Trowbridge returned to Dr. Tolek. Tr. 1386. Trowbridge reported that he had started working with a trainer, but the trainer started Trowbridge on "excessively long" activity the first day and incrementally increased the activity "way too high" the second day. Tr. 1386. Trowbridge complained of leg and shoulder pain and Dr. Tolek assessed Trowbridge with myofascial pain. Tr. 1386. Dr. Tolek wrote a letter to the trainer suggesting "very short activity in the beginning and very small incremental increase." Tr. 1386.

In April 2020, Trowbridge followed up with Dr. Koffman. Tr. 1326. Dr. Koffman wrote that "[g]enetic testing did not seem to provide any significant information thus far." Tr. 1326.

In August 2020, Kopec saw Dr. Tolek for a video appointment. Tr. 1363. Trowbridge reported severe muscle cramps in his left leg. Tr. 1363. There was

16

no known injury or strain and the pain had become intolerable over the three days before the appointment. Tr. 1363. Dr. Tolek prescribed a low dose of Flexeril and recommended hot soaks and massage. Tr. 1362.

In January 2020, Trowbridge returned to the orthotics clinic and said that he was doing well and had no issues. Tr. 1464. He wore his orthotics and reported doing stretching exercises. Tr. 1464. He denied numbness, weakness, and tingling. Tr. 1464. He was advised to continue his exercises, wear his orthotics, and follow up as needed. Tr. 1465.

In February 2020, Trowbridge saw podiatrist Stephanie Kastel, DPM. Tr. 1172. Trowbridge reported difficulty flexing his feet and having leg cramps. Tr. 1172. He had difficulty trimming his toenails. Tr. 1172. He said that his orthotics were a few months old and he had been attending physical therapy, which slightly improved his range of motion. Tr. 1172. Trowbridge's mother expressed concern that Trowbridge had a condition that prior testing had ruled out. Tr. 1172. On exam, Trowbridge had full strength and range of motion, except for limited ankle flexion due to gastrocnemius equinus (calf muscle tightness). Tr. 1177. X-rays showed metatarsus adductus (turned-in feet) and hammertoe deformities. Tr. 1177. The doctor advised Trowbridge to continue physical therapy, home therapy, and to use custom orthotics. Tr. 1177.

In January 2021, Trowbridge had a video appointment with Dr. Natowicz. Tr. 1528. Trowbridge reported that his physical medical status had been stable over the past year. Tr. 1528. Dr. Natowicz commented that whole

17

genome sequencing was the most comprehensive test to evaluate the possibility of an underlying major genetic component to Trowbridge's clinical condition. Tr. 1537. Trowbridge stated that he would like to proceed with the testing and Dr. Natowicz provided him and his mother with all relevant forms. Tr. 1537.

A brain MRI in May 2021 was normal. Tr. 1616.

*State agency opinions*[11]

In December 2016, Ermias Seleshi, M.D., reviewed Trowbridge's record and opined that Trowbridge had no severe physical impairments. Tr. 58. In March 2017, Linda Hall, M.D., agreed with Dr. Seleshi's finding. Tr. 77.

*Hearing testimony*

Trowbridge, who was represented by counsel, testified at both administrative hearings.

*August 2018 hearing*: Trowbridge testified that his fatigue and memory problems prevented him from working full time. Tr. 38. He estimated that the farthest he could walk was a quarter mile before feeling fatigued and experiencing a burning sensation in his leg. Tr. 38–39. He could stand for one

---

[11]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

hour. Tr. 39. Trowbridge could bend or squat for short time periods, Tr. 39, but squatting for an extended period of time caused his legs to shake and he would fall over, Tr. 42–43. He was unsure how much he could lift—he had the strength, but not the energy. Tr. 39. He estimated that he could sit for three to four hours before needing to get up and walk around. Tr. 39.

Trowbridge stated that he could perform chores such as running "the sweeper," make about one meal a day, and do laundry, Tr. 40. But he got tired after each chore and had to sit. Tr. 40. Making meatball subs, pizzas, and tacos for his family "took a lot out of [him]." Tr. 43. He couldn't wash dishes because holding his arms out in front of him caused his sides to ache. Tr. 40–41.

Trowbridge said that he used to ride his bike a lot and play ultimate frisbee, but he stopped these activities when he was about 20 years old because he "started getting worse with feeling more tired." Tr. 41. His hobby was computer gaming, and he sometimes attended "college-age ministry stuff" at his church. Tr. 41–42.

At Trowbridge's last job, he had difficulty using the computerized cash register. Tr. 44. In 2014 when he "had a bit more energy," Trowbridge did part-time janitorial work. Tr. 44. He was "[w]iped out" after a four-hour shift. Tr. 44–45.

*May 2021 hearing*: Trowbridge testified that he has trouble doing anything physical, including carrying groceries in from the car. Tr. 960. After one or two trips between the car and the house he is out of breath and has to

sit down for five to ten minutes to recover. Tr. 961. He doesn't have the energy to help put the groceries away. Tr. 961–62. Standing in the shower takes away his energy and he needs to rest afterwards for 15 minutes. Tr. 961. Trowbridge said that he can walk for about 100 feet. Tr. 962. He can stand for about 30 minutes and then he has to rest. Tr. 962.

When asked if he could perform a job while seated at a table sorting items, Trowbridge answered that he didn't think he could. Tr. 965. He said that his arms would get sore and tired. Tr. 965.

The ALJ stated that Trowbridge had no past relevant work. Tr. 966. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Trowbridge could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 967. The vocational expert answered that such an individual could perform the following jobs: cleaner, routing clerk, and marking clerk. Tr. 967–68.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since August 17, 2016, the application date (20 CFR 416.971 *et seq*.).
>
> 2. The claimant had the following severe impairments: intellectual disorder; anxiety disorder; attention deficit disorder/attention deficit hyperactivity disorder (ADHD); obesity; and mitochondrial myopathy (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity[12] to perform light work as defined in 20 CFR 416.967(b) except [p]ostural limitation of no climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Frequent stooping, kneeling, crouching and crawling. Frequent use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid more than occasional moderate, exposure to hazards, such as dangerous moving machinery and unprotected heights. Communication limitation of no jobs in loud work environments, such as heavy traffic noise levels. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.   The claimant was born [in] … 1994 and was 22 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

---

[12]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since August 17, 2016, the date the application was filed (20 CFR 416.920(g)).

Tr. 934–47.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

22

2.    Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.    Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.    What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.    Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Trowbridge's argument boils down to one salient point—that mitochondrial myopathy is so unusual and misunderstood that it's impossible for an ALJ to evaluate it. For the following reasons, Trowbridge's argument fails.

Trowbridge begins by stating that the ALJ "overlook[ed] the nature of mitochondrial disorders, and their often significant, but somewhat vague, effects on multiple organ systems." Doc. 8, at 19. Citing a neurology medical journal,[13] Trowbridge describes mitochondrial disorders as "remarkably diverse, and often featur[ing] non-specific symptoms." *Id*. He lists "common symptoms of mitochondrial myopathy" and asserts that physical exams are "often normal." *Id*. He asserts that there is "no established set of diagnostic criteria, and the tests used to screen for mitochondrial diseases are, even for medical professionals, difficult to interpret." *Id*. at 19–20.

---

[13]     Trowbridge did not present this medical journal to the ALJ. *See* Tr. 1114–19 (Trowbridge's brief to the ALJ after remand). If Trowbridge believed that the ALJ didn't appreciate the nature of mitochondrial diseases, one would have expected Trowbridge to first share any relevant medical information with the Agency, rather than this Court. *Cf. Myslinski v. Colvin*, No. 14-2592, 2015 WL 12556310, at *17 (S.D. Tex. July 30, 2015) ("It is not for … the court to research medical journals to determine possible limitations resulting from these identified diagnoses and impressions. Plaintiff bears the burden of proving disability"), *report and recommendation adopted*, 2015 WL 12586078 (S.D. Tex. Aug. 17, 2015).

Trowbridge complains that the ALJ relied on Trowbridge's normal objective exam findings and reports of symptoms when assessing Trowbridge's mitochondrial myopathy. *Id*. at 20. He concludes:

> the complex nature of the medical disorder at issue does not lend itself the usual inquiry into whether a claimant's subjective complaints are substantiated by well-recognized physical, imaging, or other diagnostic findings which are known to be present in individuals suffering from the medical condition alleged to be the cause of such complaints.
>
> ***
>
> because there is no single definitive test which can conclusively rule in or rule out mitochondrial dysfunction, the fact that [Trowbridge] underwent a number of tests which were confusing, difficult to interpret, or inconclusive serves only to illustrate the complex nature of the pathology at the crux of this case. It provides no probative evidence with respect to the severity of the functional impairment resulting from [Trowbridge's] mitochondrial myopathy. In logical terms, the ALJ's conclusion regarding [Trowbridge's] residual functional capacity is derived from flawed premises. There is no accurate and logical bridge between the evidence and the result.

*Id*. at 21–22; *see also id*. at 23 (stating that Trowbridge's argument "is intended … to call attention to the fact that this case involves a medical condition which is uncommon, which has a host of complex and confusing variations, and which poses a difficult diagnostic challenge even for experienced medical professionals.").

First, Trowbridge hasn't identified any legal authority requiring an ALJ to adopt a special approach when evaluating mitochondrial disorders. In fact,

the District Judge who previously remanded Trowbridge's case also rejected such an argument. *See* Tr. 987 ("although Plaintiff argues that mitochondrial myopathy should be evaluated similarly to rules and caselaw specific to fibromyalgia, he points to no such rule or caselaw requiring the ALJ do so.").[14]

Second, even if, as Trowbridge alleges, his "testimony, and his longstanding subjective complaints of fatigue, post-exercise myalgias and cramping, and exercise intolerance documented in the medical evidence of record, are consistent with the known clinical presentation of mitochondrial dysfunction," Doc. 8, at 20, that doesn't show that Trowbridge is disabled. "The mere diagnosis of [a condition] … says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see Baker v. Colvin*, No. 1:15-cv-910, 2016 WL 4128435, at *13 (N.D. Ohio Aug. 3, 2016) (a diagnosis alone does not establish that a condition is disabling, nor does it establish the extent, if any, of the functional limitations caused by the condition.").

Finally, Trowbridge objects to the ALJ's reliance on Trowbridge's generally normal exam findings to undercut Trowbridge's reports of symptoms. Doc. 8, at 20. But Trowbridge doesn't allege that the ALJ got the facts wrong, and an ALJ may rely on objective exam findings when evaluating a claimant's

---

[14]    The Court remanded Trowbridge's case because it found that the ALJ erred when he failed to follow the requirements for evaluating Trowbridge's allegations of symptoms. Tr. 987.

reports of symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *5, 7 (Oct. 25, 2017) (the ALJ considers the claimant's objective exam findings when evaluating the intensity, persistence, and limiting effects of the claimant's symptoms). Trowbridge complains that the ALJ relied on "inconclusive or confusing[15] test results." Doc. 8, at 20. Again, Trowbridge doesn't allege that the ALJ misconstrued the test results and an ALJ may rely on diagnostic findings. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *5. And Trowbridge objects to the ALJ's reliance on "the impressions of some clinicians that [Trowbridge's] fatigue and exercise intolerance are simply a function of weight and deconditioning due to inactivity." Doc. 8, at 20. But multiple providers *did* report that Trowbridge's fatigue and exercise intolerance were "contributing factors," as the ALJ observed. Tr. 945; *see also* Tr. 453 (Dr. Conner, Trowbridge's cardiologist); Tr. 486 (Trowbridge's family doctor); Tr. 786 (Dr. Koffman, Trowbridge's neurologist); Tr. 859 (Dr. Natowicz, from the genetics clinic). The ALJ's reliance upon the doctors' observations was proper. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *5.

In short, Trowbridge hasn't identified an error that the ALJ made. So the ALJ's decision should be affirmed.

---

[15]   It isn't clear what test results Trowbridge alleges were "confusing." The ALJ didn't state that he was confused by Trowbridge's test results and Trowbridge doesn't identify a medical provider indicating confusion.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: December 8, 2023

_/s/ James E. Grimes Jr._
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).